# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| RICHARD ANTHONY HERNANDEZ, | )  1:04-CV-05234 LJO JMD HC |
| Petitioner, | )<br>)  FINDINGS AND RECOMMENDATION |
| v. | )  REGARDING PETITION FOR WRIT OF<br>)  HABEAS CORPUS<br>) |
| A.K. SCRIBNER, | )<br>) |
| Respondent. | ) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  This action has been referred to this court pursuant to 28 U.S.C.

§ 636(b)(1) and Local Rule 72-302.

### PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant

to a judgment of the Superior Court of California, County of Fresno.  Petitioner was convicted by

the trial court of seven counts of first degree burglary, two counts of attempted first degree

burglary, and two counts of second degree burglary.  The trial court also found Petitioner had

1

suffered two prior serious felony convictions.  Petitioner was sentenced to an indeterminate term of 25 years to life, plus a consecutive determinate term of 20 years eight months, in state prison.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  After briefing by the parties, the Fifth DCA affirmed Petitioner's conviction and sentence.

On September 26, 20002, Petitioner petitioned the California Supreme Court for review. Review was denied on November 18, 20002.

On January 29, 2004, Petitioner filed a federal Petition for Writ of Habeas Corpus with this Court.  The petition contained four ground for relief.  On May 18, 2004, Respondent filed a Motion to Dismiss on the basis that Petitioner's fourth ground for relief (challenging the sufficiency of evidence as to a prior conviction used as a sentence enhancement) was unexhausted.

On September 28, 2004, this Court filed a Report and Recommendation recommending that the petition be dismissed for failure to exhaust the fourth cause of action.

On October 19, 2004, Petitioner filed his objections to the Report and Recommendation. Petitioner admitted that Ground Four was unexhausted and indicated that he had filed a habeas corpus petition with the California Supreme Court seeking exhaustion of that issue.  He asked the Court to hold the case in abeyance pending a decision in the state habeas proceeding.  On December 29, 2004, the Court issued and order vacating its findings and recommendations, and granted Petitioner's request to stay the petition and hold the exhausted claims in abeyance pending exhaustion of state remedies.

On July 20, 2005, the California Supreme Court denied Petitioner's state habeas petition. On August 17, 2005, Petitioner filed his Amended Petition, including the now-exhausted ground four.  On October 18, 2005, Respondent filed its Answer to the Amended Petition.  Petitioner filed a Traverse to Respondent's Answer on November 14, 2005.

<u>BACKGROUND</u>[1]

On August 7, 1998, a complaint, filed in Fresno County Municipal Court, charged [Petitioner], Richard Anthony Hernandez, with 28 felony counts. The complaint further alleged that [Petitioner] had suffered two prior convictions within the meaning of the three strikes law. (Pen. Code §§ 667, subd. (d), 1170.12, subd. (b).) Counts 1-5, 8 and 9 charged [Petitioner] with first degree residential burglary. (§§ 459, 560). Counts 6 and 7 charged [Petitioner] with attempted first degree residential burglary (§§ 664, 459, 460.) Counts 10, 11 and 25 charged [Petitioner] with possession of stolen property. ( 496, subd. (a).) Counts 12, 14, 16 and 19 charged [Petitioner] with second degree burglary. (§ 459.) Counts 13, 15, 17, 20 and 25-28 charged [Petitioner] with forgery. (§ 470.) Count 18 charged [Petitioner] with fraudulent use of a credit card. (§ 484g.) Count 21 charged [Petitioner] with possession of a forged or counterfeited identification card for purposes of committing a forgery. (§ 470b.) Count 22 charged [Petitioner] with grand theft. (§ 487, subd. (a).) Count 23 charged [Petitioner] with being a felon in possession of a firearm. (§ 1201, subd. (a)(1).)

On May 28, 1999, pursuant to an agreement with the prosecutor, [Petitioner] waived his right to a preliminary hearing. It was believed there would be a negotiated resolution of the case. In return for [Petitioner's] waiver, the prosecutor agreed to only file 11 of the charged 28 counts in the superior court, but reserving the right to amend the information prior to trial should the case not be resolved. In keeping with the agreement, [Petitioner] was held to answer on the agreed upon 11 felony counts. On June 10, 1999, the felony information was filed in superior court. [Petitioner] was charged with: seven counts of first degree residential burglary (counts 1-5, 8 and 9); two counts of attempted first degree residential burglary (counts 6 and 7); and two counts [of] second degree burglary (counts 10 and 11). It was further alleged that [Petitioner] had suffered two prior felony convictions within the meaning of the three strikes law. (§§ 667, subds. (b)-(I), 1170.12, subds. (a)-(e).) It was also alleged that [Petitioner] had suffered two prior

---

[1] This background information is taken from the unpublished opinion of the Third District Court of Appeal and is presumed correct. 28 U.S.C. § 2254(d)(2), (e)(1).

serious felony convictions within the meaning of section 667, subdivision (a).  On June 11, 1999, [Petitioner] was arraigned, entering pleas of not guilty on all substantive offenses and denying the truth of the appended allegations.  On August 24, 2000, [Petitioner], with the agreement of the prosecution, waived his right to a jury trial.  It was agreed the court trial would be conducted on the statements and reports gathered by the police, as well as items of physical evidence and any "defense testimony or other live witnesses they wish to present...."

Before trial [Petitioner] brought a motion to suppress his statements made to law enforcement after his arrest, contending his statements were not voluntarily given.  The prosecution opposed [Petitioner]'s motion to suppress, asserting [Petitioner]'s statements were voluntarily obtained after proper advisement and waiver of [Petitioner]'s rights under the Fifth Amendment.  On October 3, 2000, the trial court denied [Petitioner]'s motion, finding his statements were voluntarily given, and were therefore admissible.  On October 5, 2000 [Petitioner]'s motion to withdraw his waiver of his right to a jury trial was denied.  Thereafter, the prosecution presented its case against [Petitioner], including the introduction of two section 969b CDC packets for purposes of establishing the truth of [Petitioner]'s prior convictions.  On the same date, the court found [Petitioner] guilty of all counts, and found the alleged prior convictions true.

On November 14, 2000, [Petitioner] filed a motion requesting the court strike his two prior strike convictions, pursuant to *People v. Superior Court (Romero)* (1996), 13 Cal.4th 497. On November 29, 2000, the court denied [Petitioner]'s *Romero* motion to strike his prior strike convictions.  However, the court did strike [Petitioner]'s prior strike convictions for purposes of sentencing on counts two through eleven, under *People v. Garcia* (1999) 20 Cal.4th 490. [Petitioner] was sentenced to the indeterminate term of 25 years to life on count 1, with an aggregate determinate term of 10 years and 8 months for the remaining counts.  The two 5-year enhancements for [Petitioner]'s two prior serious convictions were added to [Petitioner]'s sentence.  (§ 667, subd. (a).)  This resulted in a total determinate term of 20 years and eight months imprisonment, with [Petitioner]'s indeterminate sentence of 25 years to life ordered to run consecutive to the determinate term of imprisonment.

1    On December 8, 2000, [Petitioner] timely filed his notice of appeal.

2                                    STATEMENT OF FACTS

3    **Suppression Hearing Evidence**

4           Prior to the arrest of [Petitioner], Detective Doug Jensen of Merced County Sheriff's

5    Department and Lieutenant David Huerta of Fresno County Sheriff's Department met and

6    discussed their plans, assuming they were able to apprehend [Petitioner] in Sacramento.  It was

7    decided that the Fresno County Sheriff's Department would interrogate [Petitioner] first

8    regarding the unsolved Fresno County burglaries, before the Merced County Sheriff's department

9    would interrogate [Petitioner] concerning his escape.  Both agencies agreed they would not

10   advise [Petitioner] of his *Miranda* rights until he had been brought back to Merced.

11          [Petitioner]'s arrest occurred about 2:00 p.m. on April 20, 1998, in Sacramento.  After his

12   arrest, [Petitioner] was transported to Merced, a trip which took approximately two hours.

13   Detective Buttrey of the Merced County Sheriff's Department drove the van which brought

14   [Petitioner] back to Merced.  Sergeant Doug Jensen, also of the Merced County Sheriff's

15   Department, was also in the van. [Petitioner] sat in the front passenger seat, Sergeant Jensen sat

16   in the back seat.  During the ride back, Detective Buttrey told [Petitioner] about their efforts to

17   recapture him.  There was no discussion of the burglaries, which were the concern of the Fresno

18   County Sheriff's Department.  Detective Buttrey spoke with [Petitioner] again, prior to

19   [Petitioner]'s interview with Fresno County Sheriff's officers. [Petitioner] asked about his wife,

20   who was also in custody on charges of aiding and abetting [Petitioner]'s escape. [Petitioner] was

21   concerned about her bail amount and asked Detective Buttrey if he could do anything to lower

22   her bail.  Detective Buttrey told [Petitioner] he had no control over that.

23          Lieutenant Huerta, who had been present during [Petitioner]'s capture in Sacramento,

24   first met with [Petitioner] at the Merced County Sheriff's offices around 9:00 p.m.  Detectives

25   Humann and Tafoya explained to [Petitioner] that their investigation concerned burglaries in

26   Fresno County and that [Petitioner]'s wife was not involved in their investigation, but was being

27   held by the Merced County authorities.  Huerta knew that [Petitioner] had expressed some

28   concern about his wife and told [Petitioner] he would check on his wife's status. [Petitioner]

indicated he wanted to have a particular attorney represent his wife. Huerta clarified with

[Petitioner] that the attorney was not for himself, but for his wife. Lieutenant Huerta indicated

[Petitioner] was willing to discuss the burglary investigation, but wanted his wife out of jail.

Huerta told [Petitioner] he could not do anything about that because she was being held by

Merced County. Lieutenant Huerta told [Petitioner] that her bail amount was $5,000. Lieutenant

Huerta then explained the normal booking process, and believed it would be similar to the

procedure followed in Fresno County. Lieutenant Huerta stepped outside of the room and asked

Merced County personnel about [Petitioner]'s wife, and was told she would probably not be in

custody much longer because of her bail amount. Lieutenant Huerta relayed that information to

[Petitioner]. At this point in the conversation, Detective Jensen, who was also in the interview

room with Lieutenant Huerta and [Petitioner], told [Petitioner] he could have her bail increased

to $100,000. Lieutenant Huerta stopped the conversation with [Petitioner] and stepped out into

the hallway with Detective Jensen. Lieutenant Huerta believed it was inappropriate to attempt to

interview [Petitioner] with "that kind of a threat over his head." There was no further discussion

of increasing [Petitioner]'s wife's bail. Lieutenant Huerta gave [Petitioner] his word "that

everything would be done to facilitate her immediate release." Lieutenant Huerta told

[Petitioner] this was Merced County and he had no control over their processing of [Petitioner]'s

wife, but was told [Petitioner]'s wife was being taken to booking and would be allowed to call

the attorney [Petitioner] had spoken of earlier. Lieutenant Huerta, who characterized [Petitioner]

as being "leery," was attempting to build up a rapport with [Petitioner]. Lieutenant Huerta told

[Petitioner], after stepping out to check on his wife's status, "[t]his is the process, and she is

going to be released and we are going to go forward with our word on it." Lieutenant Huerta said

that at this point [Petitioner] believed Lieutenant Huerta was being truthful with him. Thereafter,

[Petitioner] agreed to speak with Fresno County officers concerning their burglary investigation.

At no point during their conversation did [Petitioner] indicate he did not want to speak with

Lieutenant Huerta, nor did he request an attorney. At no point during their conversation did

Lieutenant Huerta advise [Petitioner] of his rights under *Miranda*. The only discussion between

[Petitioner] and Lieutenant Huerta concerning an attorney was [Petitioner]'s request that a

particular attorney be contracted for his wife.

> "[HUERTA]: Mr. – Mr. Hernandez said he wanted to speak, and I don't recall the attorney's name, but he specifically cited an attorney he knew.  He says, 'I want to talk to him about getting my wife out,' and–and he didn't want her in jail.  He wanted her at home. [¶] As a matter of fact, at one point in time he said he wouldn't talk to us until he got a phone call from her from her house telling him that she was home.  And I told him, I says, 'You can't assert *Miranda* on behalf of another person.'  And I said, 'And quite honestly if you get' – 'if I let you meet with another attorney, that attorney is probably going to tell you not to say nothing to us.'  And then I said, I–and then I went and confirmed with him, 'Do you want it for you or do you want it for your wife,' and he says, 'No, only my wife.'"

> [¶]...[¶]

> "...[T]hat issue came up because I was trying to clarify why Mr. Hernandez had such–he's telling us, 'I'll talk to you.  I'll talk to you.  I don't have a problem talking to you, but I want my wife to call me from' – it was pretty much, 'I want her to call me from home.  I want her out of her and I want her to have an attorney.  She's not part of this.'  You know, that kind of conversation.  I clearly asked him many times, 'Does the attorney have anything to do with you,' and the answer was, 'No.  It's not for me.'  So anything I said from that point on was based on the idea that I was helping her situation so that he would voluntarily cooperate with law enforcement."

Lieutenant Huerta never told [Petitioner] not to request an attorney for himself, nor did he ever tell [Petitioner] things would go harshly for either [Petitioner] or his wife if [Petitioner] did not cooperate.  Conversely, Lieutenant Huerta never told [Petitioner] he could do anything to help him with his case if he did in fact cooperate.

Detectives David Tafoya and Greg Humann, of the Fresno County Sheriff's Department, were the officers in charge of the investigation of the burglaries [Petitioner] was suspected of committing.  Consequently, it was their job to conduct the actual interview of [Petitioner] concerning the Fresno County burglaries.  The officers introduced themselves to [Petitioner], and then Detective Humann advised [Petitioner] of his *Miranda* rights. [Petitioner] said he understood his rights, and waived them saying "'Yes, I'll talk.'" The only issue of concern for [Petitioner] was his wife's status.  Deputy Tafoya told [Petitioner] they did not have anything to do with that.  The entire interview with [Petitioner] lasted approximately 45 minutes.  At no point during the interview did [Petitioner] request an attorney, or refuse to discuss the investigation with the officers.

[Petitioner] testified on his own behalf in support of his motion to suppress his

confession. [Petitioner] said that when he was initially arrested in Sacramento he was told he was under arrest on escape charges.  The same officer who told him why he was being arrested also read him his rights immediately thereafter.  He did recall Detective Buttrey making a "few wisecracks...that I was a hard man to find and he just kind of like credited me in a way, I guess you would say."  There was no conversation or discussion about his escape or the burglaries. Upon his arrival at the Merced County Sheriff's Office he was taken into an interrogation room. He spoke with Detective Buttrey and Sergeant Jensen, who said they were interested I the escape charges. [Petitioner] told them he had nothing to say, and his main concern was over his wife. [Petitioner] refused to discuss the escape charges with the officers.  Sergeant Jensen told [Petitioner] that Fresno County officers wanted to talk to him about some burglaries in Fresno County. [Petitioner] told Sergeant Jensen he had nothing to say until he knew what was going to happen with his wife. [Petitioner] told the officers he wanted to have attorney Bill Davis, from Merced, come in before any questions were asked about either the escape or the burglaries. Neither Lieutenant Huerta or Detective Humann were in the interrogation room when [Petitioner] made this request. [Petitioner] remembered meeting with Lieutenant Huerta about 15 to 30 minutes after his arrival.  This occurred after he told Sergeant Jensen and Detective Buttrey he wanted an attorney.  Both Sergeant Jensen and Detective Buttrey left the room, and returned about five minutes later with Lieutenant Huerta.  Lieutenant Huerta spoke with [Petitioner] for approximately 15 minutes.

> "[[Petitioner]]: He said, 'I'm Sergeant Huerta from the Fresno County Sheriff's Office and I would like to speak to you about some unsolved related burglaries that happened in my county, and I want to know if you'd be interested in talking to me.'  And I said, 'I don't want to say anything to anybody at this time.  I request my attorney to be present for me and my wife, Sylvia.'  And he had mentioned to me, he says, 'Wee,' he says, he goes, 'What's your main...concern?'  I said, 'My main concern is my wife.  What is going to happen to my wife?'  And then that's when I believe it was Buttrey mentioned he said, 'Well, your wife is going to be under arrest for harboring a fugitive and her bail is set at $1 million,' and that immediately raised a red flag upon me, and I knew that I had to cooperate with these guys in some way to assure that nothing would happen to my wife."

Lieutenant Huerta and Sergeant Jensen left the room and came back within five minutes.

"[[Petitioner]]: Huerta then left the room with Detective Jensen for about less than

ed

five minutes and came back in and he said, 'Look Richard,' he said, 'it's getting late.' He said, 'There's really no need for an attorney.' He says, 'I can work with these guys and see that your wife gets a reasonable bail. I have a couple of detectives sitting in the room next door, that if you go in there and talk to them and tell them what they want to hear, and believe me there's'–'they know what they want to hear and'–'and you don't bullshit with me, and you're straight up, and they're going to know if you're straight up or not. I guarantee you that your wife would have a reasonable bail.' And I still said to him, I said, 'Well, I'–'I would like my attorney, you know, for myself and for my wife.' And he–and then, again, he said, 'Look. Look, there's no need for it, you know. I could almost promise you that if you tell these guys what they want to hear your wife will be released,' and kind of assured me in a way, well, I guess it's okay."

[Petitioner] said that at this point he agreed to cooperate. [Petitioner] testified that the only time he was read his rights was when he was initially arrested in Sacramento. According to [Petitioner], neither Detective Tafoya or Detective Humann ever read him his rights prior to interviewing him about the burglaries. [Petitioner] said the only promise made to him was by Lieutenant Huerta:

"[[Petitioner]]: The only promise that he made to me that the main thing that I was concerned about was my wife and I wanted her to be assured that nothing was going to happen to her and that she would be out of jail that night. And he said, 'Look, Richard,' he says, 'I'm not concerned about your wife.' He says, 'I have no,' – 'I have no charges pending against your wife.' And he said, I believe he said, 'That's me speaking and Fresno County speaking. My main concern is you, to clear up some unsolved burglaries that I have in Fresno County. I have nothing to do with your wife. Merced, I can't answer that. That's up to Merced what they want to pursue your wife with.'"

At the conclusion of the hearing, and after argument from counsel, the court found the confession [Petitioner] gave to Detectives Tafoya and Humann to be voluntary. In making its ruling the court recounted the testimony presented during the hearing. The court indicated it had reviewed [Petitioner]'s section 969b packets, which had been presented to the court to establish [Petitioner]'s prior felony convictions for impeachment purposes. The court disbelieved [Petitioner]'s testimony about being *Mirandized* when he was initially arrested in Sacramento. The key aspect of the testimony the court heard in this regard, was the coordination of the two law enforcement agencies in apprehending [Petitioner]. Specifically, their arguments to the order of which agency would interrogate [Petitioner] first, and that they had agreed *not* to advise [Petitioner] of his *Miranda* rights until he had been brought back to Merced for questioning. Another point which the court relied upon was a point raised by [Petitioner]'s own counsel

9

during his argument–the escape charge [Petitioner] was arrested for was an open and shut case and there would really be no need for the Merced Sheriff's Department to obtain a statement from [Petitioner] in order to secure a conviction for that offense.

The court believed that [Petitioner] was concerned over the well-being of his wife and that [Petitioner] was interested in her obtaining counsel, in the event she was not able to make bail. The court assessed [Petitioner]'s testimony concerning this request for an attorney, not only for his wife, but for himself as well. The court concluded that [Petitioner] did not request an attorney for himself, but had in effect resigned himself to his fate. The court found his confession to be voluntary and denied [Petitioner]'s motion to suppress.

**Trial Evidence**

On October 5, 2000, Petitioner was tried on the alleged offenses by the court.

Prior to trial, the prosecution made an offer to Petitioner to settle this case that included a plea of guilty or no contest to the residential burglaries and attempted residential burglaries charged, with dismissal of the second degree burglaries. Lodged Doc. No. 15 at 871-82. After consideration, Petitioner did not accept this offer. Id. at 872.

As agreed to by the parties, this case was submitted to the court on police reports detailing the charged offenses. Id. at 860, 907. The prosecution called Detective Humann of the Fresno County Sheriff's Office in order to link Petitioner's confession to each charged offense. Id. at 875.

Petitioner submitted no evidence at trial. Id. at 920. Regarding prior conviction allegations, a packet pursuant to California Penal Code section 969b was introduced into evidence by the prosecution and reviewed by the court, without objection from Petitioner. Id. at 920-921.

<u>DISCUSSION</u>

I.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>,

529 U.S. 362, 375 fn. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the

Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. §

2254(a); 2241(d).  Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries

v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th

Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy,

521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment).  The

instant petition was filed after the enactment of the AEDPA and is therefore governed by its

provisions.

II.  Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a state court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C . § 2254(a).

The instant petition is reviewed under the provisions of the AEDPA.  Lockyer v.

Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petition for habeas corpus will not be

granted unless the adjudication in question "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State Court proceeding."  28

U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,

*quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining "clearly established Federal law," the Court

looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the

relevant state-court decision."  Id., *quoting* Williams, 592 U.S. at 412.  "In other words, 'clearly

ed

1  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth

2  by the Supreme Court at the time the state court renders its decision." Id.

3      Finally, this Court must consider whether the state court's decision was "contrary to, or

4  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

5  72, *quoting* 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may

6  grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

7  Court on a question of law or if the state court decides a case differently than [the] Court has on a

8  set of materially indistinguishable facts." Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S.

9  at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

10  state court identifies the correct governing legal principle from [the] Court's decisions but

11  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

12  413.

13      This Court may not issue the writ simply because in its independent judgment the state

14  court decision applied clearly established federal law erroneously or incorrectly; for a writ to

15  issue, 'that application must also be unreasonable." Id. At 411.  A federal habeas court making

16  the "unreasonable application" inquiry should ask whether the state court's application of clearly

17  established federal law was 'objectively unreasonable." Id. At 409.

18      Petitioner has the burden of establishing that the decision of the state court is contrary to

19  or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.

20  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

21  states, ninth circuit precedent remains relevant persuasive authority in determining whether a

22  state court decision is objectively unreasonable.  *See* Duhaime v. Ducharme, 200 F.3d 597, 600-

23  01 (9th cir. 1999).

24      AEDPA requires that this court give considerable deference to state court decisions.  The

25  state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  Moreover, we are

26  bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

27  2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

28      Application of these standards is significantly impeded where, as here, the state court

supplies no reasoned decision on some or all of a petitioner's claims. <u>Delgado v. Lewis</u>, 223 F.3d 976, 981 (9th Cir.2000). Under such circumstances, the Court independently reviews the record to determine whether the state court clearly erred in its application of Supreme Court law. <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir.2000) ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law."); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Greene v. Lambert</u>, 288 F.3d 1081, 1089 (9th Cir.2002).  That is, although the Court independently reviews the record, it still defers to the state court's ultimate decision.

III.  Review of Petitioner's Claims

      **A.     Ground One: "Slow Plea"**

In his first ground for relief, Petitioner claims that the submission of the factual issue of his guilt to the trial court for determination based on the police reports and his confession was tantamount to a "slow plea."  As a result, he contends he was entitled to be advised of his right to confront and cross-examine witnesses against him and his right against self-incrimination. Petitioner asserts that absent a knowing, intelligent and voluntary waiver of these rights, his conviction must be reversed.  Amend. Pet. 8-12.

A criminal defendant is constitutionally entitled to certain rights at trial, among them the right to a jury trial, the right to avoid self-incrimination, and the right to confront his or her accusers.  <u>See</u> U.S. Const., Amdts. V, VI, XIV.  The Supreme Court has held that a guilty plea does not comport with due process absent safeguards to ensure that a defendant's waiver of these fundamental rights is a knowing and intelligent.  <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969); <u>In re Tahl</u>, 1 Cal.3d 122 (1969).

Under California law, a "slow plea" is "an agreed-upon disposition of a criminal case via any one of a number of contrived procedures which does not require the defendant to admit guilt but results in a finding of guilt on an anticipated charge and, usually, for a promised punishment."  <u>People v. Tran</u>, 152 Cal.App.3d 680, 683 n.2 (1984).  The typical case of a "slow plea" is an agreed-upon submission of a case on the basis of the preliminary hearing transcript in which the only evidence is the victim's testimony, the defendant does not testify, and defense

counsel presents no evidence or argument on defendant's behalf.  People v. Wright, 43 Cal.3d 487, 496 (1987).  Such a submission is "tantamount to a plea of guilty" since "the guilt of the defendant [is] apparent on the basis of the evidence presented at the preliminary hearing and...conviction [is] a foregone conclusion if no defense [is] offered."  Bunnell v. Superior Court, 13 Cal.3d 592, 602 (1975); accord People v. Levey, 8 Cal.3d 648, 651 (1973).

A slow plea arrangement is the equivalent of a guilty plea.  United States ex re. Burke v. Director, Dept. Of Corrections, 524 F.Supp. 804, 805 (N.D. Ill. 1981); People v. Sanchez, 12 Cal.4th 1, 27 (1995).  And due process requires that a guilty plea be both knowing and voluntary, as it constitutes the waiver of the three above-referenced constitutional rights.  Boykin v. Alabama, 395 U.S. 238, 242-43 (1969); In re Tahl, 1 Cal. 3d 122, 132 (1969).  The prerequisite of informed and intelligent waiver of these rights is essential to a defendant's valid consent to a stipulation of facts which amounts to the "functional equivalent" of a guilty plea.  Burke, 524 F. Supp. 804; Cox v. Hutto, 589 F.2d 394, 395-96 (9th Cir. 1979); Achtien v. Dowd, 117 F.2d 989 (7th Cir. 1941).

The Fifth DCA first laid out at some depth the body of state law pertaining to slow pleas. It then analyzed Petitioner's trial in light of this precedent, and determined that Petitioner's contested submission "was not 'tantamount to a plea of guilty'" and therefore did not implicate his rights under Boykin-Tahl.  Fifth DCA Op. at 36.  First, the Fifth DCA looked at the record of the August 24, 2000 hearing in which Petitioner voluntarily waived his right to trial by jury. The court noted there was no agreed-upon disposition of the case, such as would be found in the prototypical "slow plea" situation. Fifth DCA Op. at 25-26.  Additionally, Petitioner's case was not being submitted on the basis of a preliminary hearing transcript, as there was no preliminary hearing.  Id. at 26.  Rather, the case was submitted on the basis of police reports and a detective's testimony linking Petitioner's confession with the charged burglaries.  And Petitioner would be able to introduce his own evidence or additional witnesses at trial.  Id.  On the other hand, there were negotiations between Petitioner and the prosecution, evidenced by the prosecutor's decision not to charge all 28 counts.  Id.

The Fifth DCA turned to the actual trial proceedings to determine whether the procedure

ed

at trial was, or was not, a "slow plea."  The court noted that at the outset of trial, Petitioner

attempted to withdraw his jury trial waiver.  The prosecution opposed the request, and the trial

court denied the request as untimely.  Thereafter, the prosecution offered to dismiss counts 10

and 11 if Petitioner would plead guilty or no contest to the remaining charges.  Petitioner rejected

this plea offer.  At that point, the prosecution presented its sole witness, Detective Humann, and

used his testimony to link the charged offenses to Petitioner's confession.  In addition, one item

of physical evidence was received into evidence, linking Petitioner to one of the commercial

burglaries.

The Fifth DCA noted that Petitioner's trial counsel did not call any witnesses or introduce

any evidence at trial.  However, he did challenge Petitioner's identity as the perpetrator of the

charged offenses through the cross-examination of Detective Humann.  Defense counsel elicited

testimony that none of the victims of the residential burglaries or attempted burglaries were able

to provide law enforcement with an accurate description of the burglar.  Id. at 29.  He further

secured Detective Humann's admission that there was no evidence linking Petitioner to any of

the burglaries until law enforcement found his fingerprint in a vehicle seized at one of the crime

scenes.  Id.  He also questioned Detective Humann regarding a partial latent fingerprint obtained

at one of the crime scene, and Detective Humann acknowledged that no comparison of that

fingerprint was ever made to Petitioner's fingerprints.

In his cross-examination of Detective Humann, trial counsel also sought to challenge the

validity of the procedure Humann utilized in his interrogation of Petitioner.  The Fifth DCA

found that this line of questioning was calculated to raise doubt as to Petitioner's identity as the

perpetrator.  Fifth DCA Op. at 29.  Trial counsel attempted to show that Petitioner was not in fact

confessing by providing his own facts to detectives, but was in fact confessing to the facts as

related to him by the detectives.  Id. at 29-32.  The Fifth DCA found the remainder of trial

counsel's cross-examination was directed more toward mitigation of possible punishment rather

than an attack on the sufficiency of the evidence.  Id. at 33.  Finally, the Fifth DCA noted that

trial counsel's closing argument, while extremely brief, did go to the identity issue, at least with

respect to the residential burglaries.  Id.

1    The Fifth DCA ultimately held that the proceedings were not "tantamount to a plea of

2    guilty" and therefore did not implicate Petitioner's due process rights under Boykin-Tahl.  Fifth

3    DCA Op. at 35.  Because the proceeding was not tantamount to a guilty plea, failure to advise

4    and take Petitioner's waiver of his privilege against self-incrimination was not implicated.

5    Similarly, as Petitioner never took the stand to testify, the privilege was not waived.  Finally,

6    Petitioner's counsel cross-examined the prosecution's witness on the only real fact in dispute –

7    Petitioner's identity as the perpetrator of the charged crimes. And Petitioner reserved the right to

8    call witnesses, which included, had he so chosen, calling the various victims of the crimes, or the

9    officers who prepared the police reports admitted into evidence.  Thus he was not denied, nor did

10   he waive, his right to confront the witnesses against him.  Accordingly, the Fifth DCA held that

11   the absence of waivers on the record of Petitioner's rights against self-incrimination and to

12   confront witnesses against him did not violate his due process rights.

13   The decision of the Fifth DCA is not contrary to, nor an unreasonable application of

14   clearly settled federal law.  The exchange between the prosecutor and Petitioner's trial counsel

15   on August 24, 2000 are not indicative of an agreed upon disposition of Petitioner's case, but

16   rather of an intent to contest the evidence of Petitioner's guilt at trial.  Moreover, at trial

17   Petitioner rejected the prosecution's offer to dismiss some charges in exchange for a guilty plea

18   as to others.  Instead, the trial went forward, and Petitioner's trial counsel challenged Petitioner's

19   identity as the perpetrator of the charged offenses through his cross-examination of the

20   prosecution's sole witness.  Petitioner has not cited any authority for the position that this type of

21   contested submission is tantamount to a plea of guilty, thereby implicating his rights under

22   Boykin-Tahl.  The proceeding, despite its abbreviated form, retained its adversary character.

23   Accordingly, the claim should be denied.

24   ## 2.    Grounds Two and Three: Involuntary Confession

25   In his second ground for relief, Petitioner argues the trial court erred in denying his

26   motion to suppress his confession.  Petitioner contends that his confession was given

27   involuntarily, and thus, in violation of his Fifth Amendment right against self-incrimination,

28   because it was obtained by law enforcement after a lengthy and impermissible softening up

period prior to the advisement of his <u>Miranda</u> rights.  Amend. Pet. at 12-16.

In his third claim, Petitioner asserts his confession was involuntary as it was improperly induced by promises concerning Petitioner's wife, who at the time of his arrest and confession was incarcerated by Merced County police on charges of harboring a fugitive.  Amend. Pet. at 16-20.

The right implicated in Petitioner's claims is his Fifth Amendment right against self-incrimination.  "No person ... shall be compelled in any criminal case to be a witness against himself...."  U.S. Const., Amend. 5.  Involuntary confessions in state criminal cases are completely inadmissible under the Fourteenth Amendment, *see* <u>Blackburn v. Alabama</u>, 361 U.S. 199, 207 (1960); statements taken in violation of <u>Miranda</u> cannot be used as proof of guilt, *see* <u>Harris v. New York</u>, 401 U.S. 222, 224 (1971).  The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect.  See <u>Miller v. Fenton</u>, 474 U.S. 104, 116 (1985); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226-27 (1973).  "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  <u>United States v. Leon Guerrero</u>, 847 F.2d 1363, 1366 (9th Cir. 1988) (*citing* <u>Haynes v. Washington</u>, 373 U.S. 503, 513-14 (1963)).

<u>Miranda v. Arizona</u>, 384 U.S. 436, 467-73 (1966), requires that a person subjected to custodial interrogation be advised that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed.  These warnings must precede any custodial interrogation.  See <u>id.</u>, at 444.  Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently.  See <u>Miranda</u>, 384 U.S. at 475.  A valid waiver of *Miranda* rights depends upon the totality of the circumstances.  See <u>United States v. Bernard S.</u>, 795 F.2d 749, 751 (9th Cir. 1986).

The ultimate question of whether a waiver of *Miranda* rights is voluntary is a legal question which this Court resolves independently.  <u>Miller v. Fenton</u>, 474 U.S. 104, 115 (1985).  However, the state court's determination of the underlying facts is entitled to a presumption of correctness.  <u>Id.</u> at 117; <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 626 (9th Cir. 1997).

ed

1    "Voluntary" means that the waiver was not the result of police trickery, cajoling, or

2    coercion. Miranda, 384 U.S. at 476.  Some form of coercive police activity is required to

3    demonstrate that a confession was involuntary.  Colorado v. Connelly, 479 U.S. 157, 167 (1986);

4    United States v. Chischilly, 30 F.3d 1144, 1151 (9th Cir. 1994).  A statement is involuntary if it

5    was actually coerced by physical or psychological mistreatment, threats of harsh consequences,

6    or official "inducements," such as promises of leniency, benefits, or immunity from use of the

7    statement.  Miller v. Fenton, 474 U.S. at 109; Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir.

8    1997); see also Derrick v. Peterson, 924 F.2d 813, 817 (9th Cir. 1990).  The ultimate test is

9    whether the officers engaged in conduct which overcame the suspect's rational intellect and free

10   will.  Blackburn v. Alabama, 361 U.S. 199, 208 (1960); Madeiros v. Shimoda, 889 F>2d 819,

11   823 (9th Cir. 1989).  Thus, a statement is deemed involuntary if: (1) coercive government conduct

12   exists; and (2) the conduct in fact caused the statement.  Hutto v. Ross, 429 U.S. 28, 30 (1976).

13                          Claim Two: Pre-Advisement "Softening Up"

14          As he did before the Fifth DCA, Petitioner bases this claim of involuntary waiver of his

15   Miranda rights on the California Supreme Court's holding in People v. Honeycutt, 20 Cal.3d 150

16   (1997).  The court in Honeycutt condemned the police tactic of "softening up" a suspect and

17   obtaining his agreement to speak to police before advising him of his Miranda rights.  Id. at 160.

18   In Honeycutt, the defendant was arrested on suspicion of homicide.  During the ride to the police

19   station, Detective Williams attempted to speak to him, but he sat silently.  Later during transport,

20   the defendant volunteered that Detective Williams knew him under a different name.  Detective

21   Williams then recognized him from previous police activities.  Upon arriving at the police

22   station, a different detective attempted to interview the defendant.  However, defendant

23   immediately became hostile toward this detective.  The detective left the room, and Detective

24   Williams entered.  Detective Williams engaged the defendant in a half-hour, unrecorded

25   conversation, wherein they discussed unrelated past events and former acquaintances, and finally,

26   the victim of the homicide.  Defendant, who had not been advised of his Miranda rights, agreed

27   to speak about the crime.  Three hours after being taken into custody, the defendant was advised

28   of his Miranda rights; he then confessed to the homicide.  Honeycutt, 20 Cal.3d at 158-159.  The

1  Honeycutt court found the police interrogation tactic of "softening-up" the defendant through

2  pre-advisement ingratiating conversation, resulting in defendant's agreement to talk, rendered his

3  post-advisement confession involuntary.  Id. at 160-161.[2]

4     Petitioner's reliance on Honeycutt is misplaced.  Under the AEDPA, the controlling

5  authority for purposes of federal habeas corpus petitions is the United States Supreme Court, not

6  state law.  28 U.S.C. § 2254(d)(1).  The Honeycutt decision does not constitute clearly

7  established federal law.  Moreover, the circumstances surrounding Petitioner's confession are

8  distinct from those in Honeycutt.  Unlike defendant in Honeycutt, Petitioner had knowledge of

9  the rights afforded him by Miranda, as is evidenced by his attempt to assert his wife's right to an

10 attorney, and Lieutenant Huerta's subsequent discussion with him that he could not invoke

11 Miranda rights on her behalf.  Moreover, we agree with the Fifth DCA that Lieutenant Huerta's

12 pre-advisement conversation with Petitioner "was not the ingratiating type of conversation

13 condemned in Honeycutt."  Fifth DCA Op. at 14.  Rather, Lieutenant Huerta sought to determine

14 whether Petitioner was invoking his own Miranda right to counsel, or was invoking that right on

15 behalf of his wife.  As the suppression hearing confirmed, Petitioner was concerned for his wife,

16 and the trial court reasonably concluded that Petitioner had not invoked his own right to counsel.

17 The record does not support a finding that the police engaged in coercive conduct which

18 overcame Petitioner's rational intellect and free will.  Blackburn v. Alabama, 361 U.S. 199, 208

19 (1960); Madeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989).  Accordingly, his claim should

20 be denied.

21     Claim Three: Improper Inducement

22     Petitioner asserts in his third claim that his confession was involuntary as it was

23 improperly induced by police promises of leniency toward his wife, who was also incarcerated at

24

25     [2]  The Fifth DCA notes that subsequent California Supreme Court cases have limited the
    holding in Honeycutt to the unique facts presented in that decision.  Fifth DCA Op. at __, citing

26  People v. Patterson, 88 Cal.APp.3d 742, 751 (1979) ("Honeycutt involves a unique factual
    situation and hence its holding must be read in the particular factual context in which it arose");

27  People v. Gray, 135 Cal.APp.3d 849, 864 (1982) ("But factually, Honeycutt bears little
    resemblance to the present case"); People v. Kelly, 51 Cal.3d 931, 954 (1990) (finding Honeycutt

28  factually distinguishable).

1    the time.

2          As noted above, a confession which is the result of coercive government conduct is

3    involuntary and may not be used against a criminal defendant.  Promises of leniency can render a

4    confession involuntary, as such tactics can overcome a defendant's free will.  <u>Colorado v. Spring</u>,

5    479 U.S. 564, 574 (1987).  Whether a promise of leniency rendered a defendant's waiver of his

6    *Miranda* rights involuntary depends on the promise made.  <u>United States v. Robinson</u>, 153

7    F.Supp.2d 188, 191 (E.D.N.Y. 2001).

8          A promise made regarding a loved one also in custody can render a confession

9    involuntary.  However, where the suspect raises the issue of the loved one's custody status, a

10   promise made regarding that loved one does not necessarily render any subsequent confession

11   involuntary.  <u>See</u> <u>United States v. McShane</u>, 462 F.2d 5, 7-8 (9th Cir. 1972).  The defendant in

12   <u>McShane</u> was arrested at his girlfriend's apartment for possession of illegal firearms and for

13   being a felon in possession.  The firearms in question were seized during a search of the

14   girlfriend's apartment, and both defendant and his girlfriend were taken into custody.

15   Defendant's girlfriend denied knowledge of the firearms when questioned by law enforcement.

16   While in custody, defendant and his girlfriend were permitted to meet privately, at which time

17   the girlfriend asked the defendant whether he was going to allow her to be implicated in the

18   crimes.  The defendant then told a police officer that he would confess if law enforcement would

19   let his girlfriend go.  The officer said that the girlfriend was free to leave, and the defendant then

20   confessed.  In upholding the trial court's finding that the confession was voluntary, the court

21   emphasized the fact that defendant, not law enforcement, initiated the issue of the release of his

22   girlfriend.  The court indicated that it would have serious doubts about admissibility of the

23   confession had the police expressly threatened the girlfriend with arrest and prosecution, or had

24   bargained with the defendant to get his confession in exchange for her release.  However, they

25   had not done so.  <u>Id.</u> at 7.

26          The Fifth DCA cited <u>McShane</u> and a similar California case (<u>People v. Jackson</u>, 19

27   Cal.App.3d 95 (1971)) in support of its finding that Petitioner's confession was voluntary.  The

28   court stated:

1

2

3

4

5

6

7

8

9

10

     As the foregoing cases demonstrate, a confession will not be deemed involuntary where it is the defendant who initially seeks lenient treatment in return for his admission or confession. Similarly, [Petitioner] is the one who conditioned his willingness to talk with the Fresno County Sheriff's detectives about the burglaries upon his wife being able to get out on bail. Additionally, [Petitioner's] wife was not being held by Fresno County on charges related to the crimes they were investigating, but was being held by Merced County authorities for charges of assisting in her husband's escape from custody in Merced County. There is simply no evidence to support [Petitioner's] contention that the officers from the Fresno County Sheriff's Office threatened [Petitioner] with adverse consequences to his wife should he refuse to cooperate or talk to the officers. It is true that Merced County Sheriff's Detective Jensen did tell [Petitioner] they could increase [Petitioner's] wife's bail. However, immediately following this statement Lieutenant Huerta had Detective Jensen step out into the hall with him, and admonished Detective Jensen that was inappropriate. There were no further comments concerning increasing [Petitioner's] wife's bail. Lieutenant Huerta did promise [Petitioner] that they would get his wife down to booking, so that she could be processed and in a position to post bail on the Merced County charges.

11  Fifth DCA Op. At 16-17.

12       There is no clearly established federal law as determined by the United States Supreme

13  Court on this issue. However, We find the Ninth Circuit's reasoning in McShane to be

14  persuasive on this issue, and recommend that Petitioner's claim be denied. See Duhaime v.

15  Ducharme, 200 F.3d at 600 (lower court decisions may be persuasive authority in determining

16  what law has been "clearly established" by the Supreme Court). It was Petitioner who raised the

17  issue of his wife's custody status. Lieutenant Huerta repeatedly told Petitioner that she was being

18  held by the Merced County police and was outside of his jurisdiction. Although one officer did

19  threaten to increase her bail amount, that officer was immediately removed from the room by

20  Lieutenant Huerta, and the issue of increasing her bail amount was never raised again. And the

21  promise made regarding his wife – to expedite her booking process so that she could post bail –

22  was relatively minor. The circumstances do not demonstrate that police comments regarding

23  Petitioner's wife's custody status overcame his rational intellect and free will and thereby

24  rendered his subsequent confession involuntary. Blackburn v. Alabama, 361 U.S. 199, 208

25  (1960); Madeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989). Accordingly, his claim should

26  be denied.

27      **3.**    **Ground Four: Insufficient Evidence**

28       In his final ground for relief, Petitioner claims there is insufficient evidence to support the

1   finding that his 1987 conviction for attempted burglary is an attempted first degree burglary

2   conviction and thus a prior serious felony and "strike" offense for purposes of California's Three

3   Strikes law.  Amend. Pet. at 20-23.  This claim was first presented on appeal to the Fifth DCA,

4   which rejected the claim in a reasoned opinion.

5          The law on insufficiency of the evidence claim is clearly established.  The United States

6   Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

7   federal court must determine whether, viewing the evidence and the inferences to be drawn from

8   it in the light most favorable to the prosecution, any rational trier of fact could find the essential

9   elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

10  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

11         The Fifth DCA expressly followed this standard in reviewing Petitioner's claim:

12         In determining whether there is substantial evidence to establish [Petitioner]'s
           July 987, prior conviction qualified as a serious felony, we review the record in
13         the light most favorable to the judgment, and presume in support of the judgment
           every fact the trier could reasonably deduce from the evidence.  (People v. Bamba
14         (1997) 58 Cal.App.4th 1113, 1123; People v. Purata (1996) 42 Cal.APp.4th 489,
           496.)  Substantial evidence in a criminal case is "'evidence which is reasonable,
15         credible, and of solid value – such that a reasonable trier of fact could find the
           defendant guilty beyond a reasonable doubt.' [Citation]."  (People v. Henley
16         (1999) 72 Cal.App.4th 555, 561.)

17  Fifth DCA Op. at 37-38.

18         Sufficiency of the evidence claims are judged by the elements as defined by state law.

19  Jackson v. Virginia, 443 U.S. at 324, n.16.  Under California law, the prosecution has the burden

20  of proving alleged prior convictions beyond a reasonable doubt.  See People v. Jones, 37

21  Cal.App.4th 1312, 1315 (1995).  Proof that a prior conviction qualifies as a serious felony may

22  include the entire record of the conviction, including the preliminary hearing transcript, certified

23  copies of court orders or abstracts of judgment and charging documents, and a plea reflected in a

24  minute order.  People v. Woodell, 17 Cal.4th 448, 452-454 (1998); People v. Solis, 90

25  Cal.App.4th 1002, 1018 (2001): People v. Henley, 72 Cal.App.4th 555, 560 (1999); People v.

26  Brucker, 148 Cal.APp.3d 230, 241 (1983).

27         Petitioner argues that the fingerprint card and abstract of judgment of his prior conviction

28  for attempted burglary was insufficient evidence to establish that the prior conviction was a

"serious felony."  Petitioner asserts the abstract of judgment does not adequately describe the

nature of the prior conviction to support a finding that the attempted burglary qualified as first

degree burglary.  Petitioner further asserts the fingerprint card does not sufficiently establish this

point.

The Fifth DCA disagreed, finding sufficient evidence was found in Petitioner's California

Penal Code section 969b packet.[3]  In so finding, the court noted:

> The abstract of judgment sets forth that the sentence imposed for [Petitioner's]
> prior 1987 conviction is the upper term of three years.  The punishment prescribed
> for burglary is dependent upon whether it is first degree or second degree.
>
> "Burglary is punishable as follows:
>
> "1.  Burglary in the first degree: by imprisonment in the state prison for two, four
> or six years.
>
> "2.  Burglary in the second degree: by imprisonment in the county jail not
> exceeding one year or in the state prison."  ([Cal. Pen. Code] § 461.)
>
> The punishment prescribed for an attempted burglary, currently and at the time of
> [Petitioner's] prior conviction, is one-half of the term which could be imposed for
> the actual completed crime of burglary. ([Cal. Pen. Code] § 664, former subd. (1),
> now subd. (a).)  As stated the abstract of judgment sets forth that [Petitioner] was
> sentenced to the upper term of three years, which is the term prescribed for an
> attempted burglary.  In contrast the maximum sentence which could have been
> imposed, if [Petitioner's] conviction was only an attempted second degree
> burglary, would have been 18 months (one-half of three years).  (§ 18.)

Fifth DCA Op. at 39.

The determination of the Fifth DCA is a reasonable application of the <u>Jackson</u> standard

regarding sufficiency of the evidence claims. The Court finds that the section 969b packet

introduced by the prosecution contained sufficient evidence from which the finder of fact could

find that Petitioner's 1987 conviction for attempted burglary was for attempted first degree

burglary, thus qualifying as a "serious prior" offense for purposes of sentence enhancement under

California's Three Strikes law.  Thus, there was sufficient evidence under the Constitution to

---

[3]  Pursuant to section 969b, to establish prima facie evidence of a person's prior
conviction punishable by commitment, "records or copies of records of any state penitentiary...in
which such person has been imprisoned, when such records or copies thereof have been certified
by the official custodian of such records, may be introduced as such evidence."

1  support the sentence enhancement.  Accordingly, the California courts' determination of this

2  issue was not contrary to clearly established Supreme Court precedent.

3  **RECOMMENDATION**

4      The Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be

5  DENIED and the Clerk of the Court be DIRECTED to enter judgment.

6      These Findings and Recommendations are submitted to the United States District Court

7  Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the

8  Local Rules of Practice for the United States District Court, Eastern District of California.

9      Within thirty (30) days after being served with a copy, any party may file written

10 objections with the court and serve a copy on all parties.  Such a document should be captioned

11 "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections

12 shall be served and filed within ten (10) court days (plus three days if served by mail) after

13 service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

14 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the

15 specified time may waive the right to appeal the District Court's order.  Martinez v. Y1st, 951

16 F.2d 1153 (9th Cir. 1991).

17

18 IT IS SO ORDERED.

19 **Dated:    May 9, 2008**                              **/s/ John M. Dixon**

20                                                  UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28